# WHEELING.

22   81<br>55   464

HEVENER v. McCLUNG, ADM'R, et al.

Submitted January 18, 1883—Decided July 7, 1883.

(*SNYDER, JUDGE, Absent.)

A plaintiff files a bill praying an injunction to the enforcement of a common law judgment, and asking a new trial on the ground of after-discovered evidence. The injunction is awarded, and the evidence shows, that the defence sought to be introduced, which was a legal defence, was suspected by the plaintiff to exist before the common law judgment was entered, and that he knew of two witnesses by whom it could be proven, if such defence really existed ; he not only failed to have these witnesses summoned, but actually compromised the case, and permitted a judgment to be entered against him on the plaintiff's agreeing not to issue an execution on the judgment for a year. HELD :

The court on the motion of the defendants in the chancery suit should dissolve this injunction, and the bill should be dismissed at the plaintiff's costs.

GREEN, JUDGE, furnishes the following statement of the case :

On July 2, 1878, Uriah Hevener presented to the circuit court of Pocahontas county his bill of complaint praying an injunction. The bill stated, that on April 7, 1875, the plaintiff and James T. Lockridge executed their joint bond to James M. Seig for four hundred dollars, payable on November 1, 1875; that the plaintiff signed this bond as the surety of Lockridge, and gave it to him to be used by him in borrowing money from James M. Seig, which money, when loaned by Seig, was to be used by Lockridge in buying cattle; that Lockridge delayed borrowing this money of Seig, and after keeping the bond a long time Lockridge used it in paying some of his debts; that after Seig's death an attorney for his administrator presented this bond to the plaintiff for payment. Suit was brought on the bond in the circuit court of Pocahontas and judgment obtained by default on May 1, 1877, against both obligors, and an execution was issued

*Counsel below.
11

thereon May 7, 1878, which was levied on twenty head of plaintiff's cattle. This judgment was permitted to be rendered by default because he was informed, that his defence to it was not a good legal defence, but was only an equitable defence. He then says, that he believes and feels assured he can prove, that this bond was never delivered to James M. Seig in his lifetime, but that he the plaintiff never knew the evidence of this fact till within the last few weeks, and he could not have found it out by due diligence. The bill prays, that he may be allowed to make defence to this judgment, and that the sheriff of said county and David G. McClung, administrator of J. M. Seig, may be enjoined from the collection of this execution, and for general relief. The bill was sworn to by the plaintiff, and the injunction asked was at once awarded and served on the parties.

The summons to answer this bill was served upon Lockridge as well as Seig's administrator. The administrator of Seig filed his answer to this bill, in which he states, that at the time said judgment was rendered by default, Hevener, the plaintiff, knew all the facts connected with the execution and delivery of this bond, and threatened to make a defense based on the matters alleged in the bill, but finally agreed, that if execution on the judgment was permitted to lie until April 1, 1878, the judgment might be entered for the full amount due on this bond by default. This was accordingly done, and no execution on this judgment was placed in the hands of the sheriff for more than a year; one which had been previously issued being allowed to lie in the clerk's office. The answer states that this bond was given for a full consideration, and that it came to his hands in due course of administration and denies, that it was never delivered to Seig in his lifetime; but if this were so the plaintiff, Hevener, knew all about it, when he agreed to let the judgment be entered upon it by default. There is filed with this answer a letter dated June 19, 1878, from the plaintiff to John S. McNulty, who was the administrator of Seig in Virginia, asking him to direct, that this execution in favor of the West Virginia administrator be not enforced, as the writer, Harman, could not then get anything out of Lockridge, but he says he can get him to pay it after August. He

says, that he would pay off the execution himself if he could raise the money. He hopes that he will wait till the fall, as he thinks he will get the money by that time. This answer was sworn to by the administrator of Seig. It was replied to generally, and on October 1, 1878, on the motion of Seig's administrator, the court dissolved the injunction which it had awarded. An effort was made to prevent this dissolution by filing an affidavit of the attorney for Hevener, but it is unnecessary to state the contents of this affidavit.

The plaintiff afterwards filed what is called a special replication to this answer. This paper called a special replication was sworn to on February 28, 1879. It was filed with leave of the court, and it was improperly filed, as a special replication is not a recognized mode of pleading in chancery, except where the answer is in its nature a cross-bill and asks affirmative relief. The plaintiff in this paper called a special replication denies, that there was any understanding, that he would make no defence, if execution was not allowed to issue for a year; but that if he did make an agreement it was broken, as an execution was issued on this judgment within two weeks after it was rendered, that is on May 14, 1877. The copy of the execution is filed and endorsed as coming into the sheriff's hands on May 16, 1877. Besides the denials of all the statements of the answer, which contradicted the statements in the bill, which denials are set out at great length, the only new matters deemed of importance to be stated, and which are set out in this paper, are first, that contained in this statement: "Plaintiff denies positively and emphatically, that he knew any facts connected with the delivery of said bond whatever, and only found out the non-delivery of the said bond on the 2d day of July, 1879, and he immediately applied to this Court for relief;" Second, that contained in the allegation, that the plaintiff was much injured by the withdrawal of this execution, as it could have been levied on property of the principal, Lockridge, and made out of him, which cannot now be done. He says it was withdrawn at the instance of Lockridge in accordance with an understanding between Lockridge and the attorney for the administrator of Seig, as appears from a letter which Lockridge wrote. He admits the writing of the letter to

the administrator of Seig in Virginia, and says he wrote it because he had lost all hope of making a successful defence to this judgment, not then knowing the facts.

At March rules 1879, the plaintiff filed an amended bill. It sets out the facts stated in the original bill and in this special replication, and complains especially, that the first execution issued on this bond had been withdrawn by the plaintiff, when had this not been done it could have been made out of the principal, as he had then an abundance of property, which had all been swept away by subsequent executions of other parties, and lastly he claims, that this bond went into the hands of the administrator in Virginia, and that the plaintiff had no right to sue upon it, and states as he did in the special replication, why he had written the letter he did to the Virginia administrator. This amended bill prays, that the injunction, which had been awarded may be reinstated, and that the defendant, D. G. McClung, may answer on oath by what authority he brought suit to recover a fund, which if ever any part of the assets of Seig's estate was under the control of the Virginia administrator of the estate. And it prays for general relief. This amended bill was sworn to by the plaintiff.

D. G. McClung, administrator of James M. Seig, answered this amended bill and says, that as the West Virginia administrator of Seig it was his right and duty to collect said bond, and that the legal ownership and control of these debts were in him alone. He alleges, that the first execution on the judgment on this bond lay in the clerk's office for one year with the plaintiff's consent and at his request. This answer is sworn to by the defendant, but before the filing of this answer, the case having been considered on this special replication and amended bill taken for confessed, the court reinstated said injunction by an order made April 29, 1879. The following depositions were taken in the case on behalf of the plaintiff. First, the deposition of Samuel B. Hannah. He proved nothing, except that about a week after Hevener had signed this bond to Seig for four hundred dollars as security for Lockridge, he asked the witness to tell Hevener, that he Lockridge had failed to get the money on this four hundred dollar bond, and he wanted him if possible to help him out of

his present trouble; that he owed Jacob Sibert for cattle one hundred dollars, which he wanted to pay him, and that he had bought these cattle for Hevener. And the day before the bond was signed Lockridge told him that he wanted to buy some of Hevener's cattle, and that he would go and see him the next day. He did go there the next day, and this bond was executed that day. He states that he never told these facts to Hevener till after this suit was brought. James T. Lockridge testified, that this bond was shown to James M. Seig, who said that he did not then have the money, but that he would have it soon, and that he Lockridge might draw orders on him for the amount of the bond, and that he would honor them; that he Lockridge could keep the bond for him or send it to him by mail. The orders were drawn for the full amount and the money was paid by Seig, most of it to R. Campbell on a judgment in favor of Gunn. When Hevener signed this bond he was informed by witness, that he wanted this money principally to pay this debt to Campbell. The money with which he the witness wanted to buy the cattle was to be raised by two negotiable notes drawn by witness and endorsed by Hevener, one on the Lexington Bank, and one on the Bank of Weston. But as he failed to get these notes discounted he abandoned the idea of buying these cattle. He did not deliver this bond to Seig in his lifetime, but as Seig had advanced the money on it and he held it for Seig, he gave it to Charles P. Jones, the attorney for the administrator of Seig, the first time he saw him after Seig's death. He says he never did avoid telling Hevener this, and he supposed, that he knew all about it, and knew that he the witness had got the money on this bond from Seig. The recollection of the witness is, that the attorney of the administrator of Seig's estate showed him a letter, written to him by Seig from Richmond, telling him to get this bond. He says his relations with Hevener were always very friendly; he often did favors for him, by going on his paper, when witness wanted to raise money. This witness says, that at court when judgment was obtained on the bond, Hevener, the witness and Jones, the counsel for Seig's administrator, talked the whole matter over together, and that Hevever spoke of defending the case in court. After a full con-

versation about the whole matter, and after witness explained to Hevener, that when he signed this bond he agreed to let judgment go by default, if the execution was allowed to lie for sometime, the witness then said: "I can't say positively, that Hevener did or did not know, whether the bond was delivered over to Seig in his lifetime, but my recollection is, that this matter was talked over between Jones, Hevener and myself." Hevener testified in his own behalf, and the following is all of his testimony, which really has any bearing on the case:

"2d Question—What was your reason, if any, for not making defence at law to the judgment in controversy in this suit?

"Answer—I was not in possession of such facts at the time said judgment was obtained as would enable me to make a defence, at least my attorney so informed me after I had stated to him all the grounds of defence I then had, so I let the judgment go by default; but more than a year after said judgment was obtained I accidentally heard some facts in regard to the delivery of the bonds upon which the judgment was obtained, which enabled me to make, I believe, a valid defence, and I instituted proceedings accordingly. I knew from the beginning, but was unable to prove it sufficiently, that there was some fraud practiced on me in some way in this transaction, but I never knew until the 2d day of July, 1878, that the bond had never been delivered to James M. Seig in his lifetime, and James T. Lockridge, in whose knowledge this fact was, would never talk to me or communicate to me fully in regard to the facts, and but for Lockridge having talked to outsiders, I believe I would have still been in total ignorance of how the whole thing was managed between said Lockridge and Seig's administrator. I had gone Lockridge's security on said bond for a specific purpose, but Lockridge failed to get the money on the bond as he expected, and as his deposition in this case shows, as well as a letter from said Lockridge of date April 10th, 1875, which letter is herewith filed marked 'AA, February 28th, 1879.' After said Lockridge's failure, as above stated, I heard no more of said bond, until I think in the month of January, 1877, nearly two years after its execution, and more

than a year after the death of James M. Seig, when it was brought to my attention by an attorney for Seig's administrator. I denied that such a bond was out, but when the bond was produced I recognized my signature and remembered for what purpose the bond was executed. Lockridge stated to me that this was the bond that I had signed to enable him to borrow money from Seig, but as he had not gotten the money from Seig, he (Lockridge) had turned the bond over to Seig in payment of his (Lockridge's) debts, but he never said a word to me about the time he had turned the bond over, nor to whom, leaving the impression on me that he had delivered it to Seig in his (Seig's) lifetime.

"3d Question—State what was the agreement, if any, between you, James T. Lockridge and Charles P. Jones, attorney for James M. Seig's administrator, in regard to said judgment being entered and execution issuing thereon.

"Answer—At the term of the circuit court at which said judgment was obtained Charles P. Jones, attorney for Seig's administrator, and James T. Lockridge, the principal in the bond, came to me and talked to me about the justness of the debt, and tried to convince me that I had no defence and ought not to make any defence, and Jones made the proposition that if I would make no defence execution might lie a year, to which proposition I in nowise agreed, for I always intended if I had sufficient ground to make a defence to make it, and did not intend to compromise myself by any agreement, and I here file a letter marked 'BB., February 28th, 1879,' received from James T. Lockridge, dated May 25, 1877, as a further part of this deposition. Said letter was written less than a month after the judgment was obtained.

"4th Question—State under what circumstances did you write the letter marked 'U. H.,' filed as a part of the answer of Seig's administrator.

"Answer—At the June term of the county court of this county, I met Mr. Jones, the administrator's attorney, and told him that the sheriff was after me with the execution, and that it was utterly impossible for me to raise money to pay it at that time. I said this to Jones, thinking that, and being advised there was no alternative left me but to pay the

debt. I asked him what could be done about it, and he told me to write to John S. McNulty, which I did at his instance, and that is the letter. But at that time I was not in possession of the facts that led me to institute this suit. McNulty replied to me that the whole matter was in Jones's hands, and that he would not interfere with it. That letter was written some time before the institution of this suit.

"5th Question—What diligence, if any, did you use to obtain valid defences to said judgment prior to the time it was rendered?

"Answer—I used every diligence in my power. I hunted up the letters of Lockridge, which I will hereafter file as a part of this deposition. I tried in every way to refresh my memory in regard to the matter. I tried to get information out of Lockridge, but the only thing Lockridge would tell or do in the matter was to try to convince me that the whole thing was fair and just, but strenuously avoided telling me the bond was never delivered to Seig in his lifetime. The letter of James T. Lockridge, here filed marked 'CC, February 28, 1879,' I received about the second or third day of February, 1875. Letters of said Lockridge marked 'DD, February 28, 1879,' dated February 20, 1875, 'EE, February 28, 1879,' dated February 27, 1875, 'FF, February 28, 1879,' dated March 21, 1875, were letters that refreshed my memory in regard to the execution of said bond. At the May circuit court, 1875, which court came on the first day of that month, a different arrangement was made between myself and Lockridge to get money elsewhere than from Seig, and on the 11th May, 1875, Lockridge wrote me a letter, which is here filed as a part of this deposition, marked 'GG, February 28, 1879,' showing such arrangement."

In the letter marked "AA," dated April 10, 1875, Lockridge says to Hevener: "I failed to get the money from Judge Seig, as he had given me out coming for it, and laid it out for a lot of cattle a few days ago. Seig says, that he will raise me the four hundred dollars in a few weeks, as Glondey owes him a thousand dollars, and promised to pay it soon." This letter also refers to the two negotiable notes, of which Lockridge in his deposition spoke as having been endorsed by Hevener for his Lockridge's accommodation,

and in it Hevener is asked to write to the banks and put him right before these banks, so that they will discount these notes.

The letter marked " B. B.," was as follows:

" HOME, May 25th, 1877.

" *Mr. Hevener:*

" DEAR SIR:—The execution you referred to was issued by Mr. Curry by mistake. I called his attention to it, and he has directed Cackley to return it to the office without levy, as it was the understanding with Jones and myself, the matter was to lay twelve months. Rest assured you shall not be annoyed with it.

" Respectfully,<br>"JAS. T. LOCKRIDGE."

All the other letters referred to in Hevener's deposition were written in 1875. One of them speaks of his expecting to buy cattle of Jacob Sibert for Hevener, to be paid for on April 6. This is the transaction referred to in Hevener's deposition. These letters throw no special light on this case. They only show, that there were the most friendly and confidential relations between Hevener and Lockridge, and that Lockridge constantly relied on Hevener to aid him, whenever he wanted to raise money; he was engaged in buying cattle as the letters show. The defendants took no evidence. On June 4, 1881, on the pleadings and evidence, and the motion of the defendant, Seig's administrator, this injunction was dissolved, with costs and damages against the plaintiff according to law; and to this decree the plaintiff has obtained an appeal and *supersedeas.*

*J. M. McWhorter* for appellant.

*Alex. T. Mathews* for appellees.

GREEN, JUDGE:

From the evidence in this case, which consists of depositions taken by the plaintiff, I understand the facts to be substantially these: Hevener, the plaintiff, was on very friendly and confidential terms with Lockridge, who was engaged

in buying and selling cattle.   He was in the habit of endors-
ing for Lockridge, when the latter wanted money to buy
cattle or pay debts, which he had contracted; and sometimes
Lockridge bought cattle for Hevener.   Being in need of
money on the 7th of April, 1875, Lockridge informs Hev-
ener that Seig would lend him four hundred dollars, if he would
sign a bond as his security, payable to Seig for this amount.
There is no distinct evidence to show precisely what Lockridge
wanted with this money, but from the relations of the par-
ties there can be no doubt but that it was fully explained to
Hevener.   He as was his custom signed this bond as security
for Lockridge.   In the meantime Seig had expended the
money, which he expected to let Lockridge have, but told
him, that he thought in a few weeks he would let him have
it on this bond.   Lockridge informed Hevener by letter of
this fact, and subsequently he arranged with Seig to draw
drafts on him to the amount of this four hundred dollars,
which drafts Seig met, it being understood when this four
hundred dollars was thus advanced, that Lockridge would
deliver this bond to Seig.   But after this four hundred dol-
lars had been advanced and before Lockridge saw Seig, he
died, and Lockridge handed the bond to the attorney for
Seig's administrator, having been asked for it by the attor-
ney, who was informed, that it was in the hands of Lockridge
for Seig by a letter written to him by Seig before his death.
The moneys paid by Seig on these orders of Lockridge were
paid to persons, in all probability, whom Lockridge had told
Hevener he intended to pay with this money.

There is no satisfactory proof, that this money was used in
a manner different from what Hevener expected it to be
used, though it is but fair to presume from the relations of
Lockridge and Hevener, that Hevener when he signed this
bond, was willing that Lockridge should use the money in
any manner he pleased, and that there was no understand-
ing that it must be used in any particular manner.   This
bond of four hundred dollars made payable to Seig not
having been paid, suit was brought on it.   Hevener, who
appears to be a litigious man, threatened to defend the suit,
though on what grounds does not appear, but as the facts
show no other ground legal or equitable, on which he could

dispute it, the inference is, that he proposed to dispute his liability on the ground that the bond had never been delivered to Seig in his lifetime, but that it was delivered to his administrator after his death. This inference is corroborated by what Lockridge says. In his deposition he says, that his recollection is, though he is not positive, that he and Hevener and the attorney for Seig's administrator, talked together about this bond never having been delivered to Seig in his lifetime; and after this conversation it was agreed, that if Seig's administrator would not issue any execution on the judgment for a year, Hevener would not defend the suit.

Accordingly we find, that a judgment for the full amount was rendered by default against Lockridge and Hevener, and that no execution was placed in the hands of the sheriff to enforce the payment of this judgment for more than a year. And when it was placed in the hands of the sheriff he levied on twenty head of cattle belonging to Hevener, and that he brought this suit to enjoin the enforcement against him of execution and this judgment.

It is true Hevener denies, that he ever made such an agreement, and complains, that no execution was issued and levied for more than a year, and he shows, that if an execution had been issued promptly the money could have been made out of Lockridge, the principal. But the very letter he produces to prove this shows, that there was such an understanding, and that Hevener complained when an execution by mistake had been promptly issued, and on his making this complaint it was withdrawn. Hevener also positively denies, that he ever knew till the 2d day of July, 1878, that this bond was never delivered to Seig in his lifetime. This was sworn to, and it is reiterated in his amended bill also sworn to, and again in his deposition. He asserts, that Lockridge, who knew this fact, would never talk to him fully in regard to it, and but for the fact of his having talked to outsiders, he would still have been ignorant of this fact; he avoided telling him, that the bond was never delivered in Seig's lifetime, but he says he knew from the beginning, but was unable to prove it sufficiently, that there was some fraud practiced on him in some way in this transaction. These statements could not be received as correct, if there was no evi-

dence in this case other than the sworn statements of the plaintiff. The letters he produced show, that there were between him and Lockridge the most friendly and confidential relations, rendering it highly improbable, that Lockridge would have avoided telling him, that this bond had been delivered after the death of Seig, if he had been really anxious to ascertain all the facts in reference to this transaction.

Again, if it was true that on the 2d day of July, 1878, the day he got this injunction, he first learned this important fact thus studiously kept hid from him from some outsider, why was not the name of this outsider stated, and why was not his deposition taken to corroborate this statement of the plaintiff? For the plaintiff well knew that unless he thus learned this fact after the judgment against him he could not now resist this claim. That there was no such outsider upon whom he could call to prove this is shown by his having called on an outsider, Hannah. to prove, not this important matter, but some comparatively insignificant facts, which he had not told the plaintiff till after this suit was brought. But what is a conclusive refutation of these statements of the plaintiff is his own original bill, which he swore to as true. This affidavit was made on July 2, 1878, the very day on which he says he first learned, that this bond was not delivered till after Seig's death. But on July 2, 1878, in his bill he says: "The evidence of the fact, that this bond was not delivered to James M. Seig in his lifetime, the plaintiff never knew until within the last few weeks." So that the positive and emphatic declaration so repeatedly made, that he never knew of this fact till July 2, 1878, is certainly not true. And what is still more remarkable, on the 19th day of June, 1878, just about two weeks before this bill was filed, the plaintiff, Hevener, wrote a letter to the Virginia administrator of Seig promising to pay this judgment in the fall of 1878. This promise must have been made after he was informed, if his bill states the truth, that this bond on which this judgment was based had been delivered after the death of Seig. The inference is, that Hevener when he filed this bill had forgotten the writing of this letter. But after it was produced he changed the date of his obtaining this information to July 2, 1878, which was after the date of this letter.

I judge from the somewhat vague manner, in which he speaks of this subject in his original bill, that all that could have been truthfully said was that he had reason to suspect, when he permitted said judgment to be entered against him by default, this bond had not been delivered to James M. Seig in his lifetime. Yet he had not then nor had he when he filed his bill any positive evidence thereof, never having catechized Lockridge or Jones, either of whom would have known the fact in reference to the details of its delivery. From the whole evidence I draw the conclusion, that Hevener knew, when he permitted this judgment to go against him by default, exactly what he knew when he filed this bill on July 2, 1879, and that he obtained this information from Lockridge before the judgment, and that he never heard afterwards anything about the matter from any one else.

The appellant's counsel refers to *McPherson* v. *Meek*, 30 Mo. 345, and *Commonwealth* v. *Kendig*, 2 Pa. St. 448 to show, that till delivery to the obligee a bond can not bind the obligors, as delivery is essential to the validity of a bond. The appellees' counsel insists, that this common law rule is overthrown by the Code of W. Va. ch. 99 § 12. We have not examined these authorities or considered this question, for if this were a good defence it is obvious, that it is a legal and not an equitable defence; and a court of equity can not hear a party asking to enforce a legal judgment and have a new trial, on the ground of after-discovered evidence, when it is made to appear as it does in this case, that he had an intimation of his legal defence before the judgment was rendered against him, and that he knew by what witnesses he could establish such defence, if it could be established at all, and not only failed to have them summoned, but actually compromised the suit and permitted judgment to go against him. I say compromised the suit for it is obvious, that at Hevener's instance and his agreement when the judgment was entered, the execution was not pressed for one year, though he has the effrontery to complain of this in his amended bill as an injury to him, and to ask for this reason, that the enforcement of the judgment may be enjoined. His letter to the Virginia administrator, and his failure to make any complaint of this extension of time in his original bill the

deposition of Lockridge, and even the deposition of Hevener show, that this withholding of the execution was done at Hevener's instance, and in accordance with an agreement made with him before the judgment was rendered.

The only other ground, on which it is sought to reinstate this judgment is, that the money obtained by Lockridge on this bond was perverted from the use to which it was to be applied, according to the understanding of the parties. It is sufficient to say, that the evidence fails to prove, that this money was used by Lockridge in violation of any understanding with Hevener, and there is no pretence, that when Seig made the advance of the money on the orders of Lockridge, he had any idea, that there was any misappropriation being made of this money. In fact there was none. I deem it unnecessary to comment on the allegation, that the Virginia administrator had no right to sue a West Virginia debtor for a debt due the estate.

The appellant's counsel refers to *Whichard* v. *Jordan*, 6 Jones L. 54, and *Respass* v. *Latham*, Busb. L. 138, North Carolina, as cases, in which there is some similarity in some of the points decided to those involved in this case. I have examined these cases, and fail to discover any similarity. The first simply decided, that by the common law a delivery was essential to the validity of a bond, and that a delivery of a bond to a stranger is no delivery of the bond, unless it was delivered to the stranger for the use of the obligee. In the second case it was held, that the acceptance by the obligee is as necessary as the delivery by the obligor. These cases might have been good authority for the appellant in the common law court had he defended this suit there, but they are foreign to the questions raised in this case, according to the views we take of the evidence.

Our conclusion is, that the court below committed no error for which its judgment should be reversed, and that its order or that of the judge in vacation made on June 4, 1881, should be approved and affirmed, and that the appellee, the administrator of James M. Seig, must recover of the appellant his costs in this Court expended and damages according to law.

JUDGES JOHNSON AND WOODS CONCURRED.

JUDGMENT AFFIRMED.